OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The defendant was indicted for criminal possession of a weapon in the third degree. At the commencement of a pretrial hearing the prosecutor disclosed that the scratch and typed copies of one of the two UF61s prepared in this case and of the scratch copy of the police property invoice, known as a voucher, were missing. Because Rosario material was missing *84 and because Rosario violations occur with stunning frequency, this court ordered a hearing on the procedures used in the police department for making and preserving police records prepared after an arrest, the procedures for delivering the documents to the prosecutor, and the procedures used by the prosecutor for delivering the paperwork to the defense. The hearing was delayed so that a search for the documents could be conducted and, by the time of the hearing, the scratch copy of the voucher had not been found and was reported lost.
At the hearing the People called Captain Edward Delatorre, the commanding officer of the 42nd Precinct, Sergeant Timothy Maddock, the training officer for the 45th Precinct, and Police Officer Frank Parker. They all gave testimony about procedures for compliance with the Rosario rule. As a result of the testimony, this court found that the missing document was lost because police procedures were not followed, drew an adverse inference against the People and discredited portions of Officer Parker’s testimony about the reason for the stop and search of the defendant.[1]
1. Police Department Policy for Implementing Rosario
In December 1987, the police legal department issued a bulletin that stated in part: "The importance of preserving all statements made by witnesses cannot be stressed enough. Any failure to produce Rosario material, regardless of good faith effort in attempting to locate it, will result in the reversal of a conviction. Any statements made by a witness must be disclosed to the defendant’s attorney by the prosecutor no matter how the statements are recorded. Even worksheets, which are incident to the arrest, must be disclosed.”
Another bulletin was issued on August 1991, directed arresting officers to: "a. Preserve all of your notes, records and police reports of any kind in an arrest folder. This includes all handwritten notes. Be sure to include photocopies of any entries you made in your Activity Log, whether written on the front or the back of the page.” Delatorre explained that the "folder” mentioned in the memo means any container, such as an envelope, and that the container is kept wherever the police officer chooses.
*85 The August 1991 memo then continues:
"b. Each time you are assigned to court in connection with the arrest — including your first trip to the Complaint Room immediately following the arrest — bring the complete folder with you and show its entire contents to the assistant district attorney (A.D.A.) assigned to the case. Allow the A.D.A. to photocopy whatever he wishes from the folder.
"c. If you prepare scratch copies of official police reports that are later typed, save a photocopy of the scratch copy in your folder. As soon as possible, obtain a copy of the typed report and place that in your folder as well.
"d. Do not permit anyone except the A.D.A. to remove an original document, such as your handwritten notes from your folder. The A.D.A. may be given an original document from your folder but you should make a photocopy first. All other persons entitled such as supervisors or detectives who are assigned to the case should be given photocopies only of any documents in your folder.”
The memo also directs those officers who are not arresting officers but who prepare notes or official police reports such as DD5s or UF61s to make copies for the arresting officers to put in the case folders, to save copies of those reports and handwritten notes, and to bring them to the prosecutor’s office.
To enable arresting officers to provide information and documents to prosecutors quickly and efficiently, the Police Commissioner issued an order on June 28, 1991, directing that copies of police reports and paperwork prepared in a case resulting in an arrest be given to the prosecutor in the complaint room. Photocopy machines were to be made available to officers so that those forms that did not have multiple pullout copies could be photocopied. To ensure that all the required forms were prepared and included in the package for the prosecutor, the police department directed the use of an arrest documentation checklist, hereinafter called "checklist” (see, Appendix). The checklist, although not an exhaustive list, sets out the documents that might be prepared as a result of an arrest.[2] The form also includes eight blank lines for addi *86 tional documents or reports that might be prepared. Every document that is prepared, whether on the printed list or not, is Rosario material. The form is designed to ensure that all required documents are prepared and to remind the arresting officer that all documents that are prepared must be brought to the complaint room and to court.* *[3]
2. Training of Officers to Comply with Policy
For five weeks at the Police Academy, the cadets take a daily 90-minute course called "Police Science.” In this course the cadets learn about the preparation of police reports and the procedures concerning the reports. In a second course, a daily 90-minute study of legal principles, the cadets learn about the Rosario rule. The student guide repeats exactly the *87 text of the 1991 police legal department memo set out above. The cadets are taught the specific forms that are required for a particular kind of case. In this period of study, the cadets use the patrol guide as well as the student guide.
At both the 42nd Precinct and the 45th Precinct each newly assigned officer goes through additional training. A sergeant takes the new officers through the preparation of the paper work and the folder, as well as training in preserving paper work for trial. This training is similar to the training at the Police Academy; it takes place at the precinct in the normal workday.[4]
Twice a year the Police Academy publishes materials and sends instructors to each borough for training. Between September 1993 and February 1994, a training program was conducted at every precinct in the City; a 90-minute segment of this program was about Rosario issues and it had to be completed by all officers in the department. Specific printed materials on Rosario were given to each officer.
3. Procedures Related to Documents Made After an Arrest
When an officer enters the precinct with a prisoner, he appears before the desk officer with the prisoner. The desk officer notes in a log that an arrest was made and its location. The arrest interview sheet is prepared for pedigree information. The prisoner’s property is counted and a receipt signed by the prisoner if he is allowed to keep the property. The prisoner is then placed in a cell while the arresting officer prepares the relevant arrest documents. There are required documents for each case depending on the crime charged and the circumstances. Each officer, through training and experience, is expected to know that documents must be prepared.
After all the paper work is prepared, the officer indicates by a mark on the checklist the documents prepared and takes the reports and the checklist to the desk officer. The officer reviews the paper work to ensure that all required documents are in the folder and ready to take to the prosecutor in the complaint room. The desk officer, based on his or her own training, will know if a document that is required has not been prepared. If a required document has not been prepared, *88 the desk officer will have the arresting officer prepare it. The desk officer puts a mark on the checklist next to each document prepared and must sign off on the checklist when he or she is satisfied that all the reports are prepared.
The arresting officer then brings all the paper work to the prosecutor in the complaint room. The assistant then compares the checklist to the papers in the file and signs off on the checklist.
All paper work must be completed and the defendant transferred to a central booking within three hours of arrival at the precinct. If the defendant is not brought to the courthouse within three hours, an additional form must be prepared by the desk sergeant explaining the reason for the delay.
The officer must add to the file any paper work prepared after the initial arrest documents are completed and give copies of the additions to the prosecutor at the next meeting. Documents prepared by another officer must be copied and added to the folder.
If the prosecutor needs any other documents, it is not necessary to use a subpoena. Rather, the prosecutor need only make a request for a missing document on office stationery supplying the case information and the document requested. This procedure is used when an officer fails to supply all the documents on the checklist and to obtain copies of documents prepared by the officer after the complaint room procedures. The letter is sent to police headquarters and someone there makes copies of the papers requested and sends them to the prosecutor’s office. If the document is not at police headquarters, the request is forwarded to the precinct. The request can be made directly to the precinct by letter or telephone call.
4. The Documents
a. Voucher
If evidence, such as a gun, is to be retained by the police department, the officer signs out a security envelope and a property clerk invoice form, also known as a voucher. The envelopes and the vouchers are kept in a drawer behind the front desk at the precinct and the desk officer must account for each one. The person who takes the envelope and the voucher must record the number of each in a log book and sign his or her name next to the entry. Each voucher comes in a set of four and, like the envelope, is prenumbered. The *89 envelope number begins with an A and the voucher number begins with an F.
The voucher must be typed. The officer may type it depending on the circumstances including the officer’s typing skills, the number of items to be listed and the time needed for processing the defendant. On the other hand, the officer may handwrite a voucher worksheet on a form that is used for making a scratch copy having no pullout copies and no preprinted number. If a scratch copy of the voucher is prepared, the information is then typed by a police aide on an official form that has a voucher number. The typed copy of the voucher is read and compared to the handwritten copy by the arresting officer and signed by him or her. It is attached to the typed voucher and given to the desk sergeant to check. A copy is then given to the officer. The practice until April 27, 1994 (see, supra, n 3) was that the officer who prepared the scratch copy was responsible for keeping it.
b. Complaint Report
The complaint report, known as the UF61, must be typed. The officer generally handwrites the information on a sample form labelled "worksheet” and leaves it in the typing pool for typing and numbering.
Generally, when the officer goes to the desk officer and the complaint room he will have with him only a copy of the scratch copy because the typed form is not yet prepared. The scratch copy is specifically listed on the checklist; the typed copy is not. If the UF61 is not typed by the time the officer must leave for the complaint room he can verify for the desk officer that the scratch copy is correct and make a copy to take with him to the complaint room. The scratch copy is typed and it is attached to the typed copy by the typist. At some point in the shift, the desk officer compares the typed complaints with the scratch copies.
If the typed copy is completed by the time the officer leaves for the complaint room it is reviewed by the desk officer, copies of both the scratch copy and the typed copy are made for the complaint room, and the typed copy of the complaint is to be added to the checklist.
The typed UF61 is made on a form that has pullout copies and is distributed to the criminal records section at police headquarters, the arrest coding and crime section, the community policing unit, and, where appropriate, to the units han *90 dling particular types of crimes. By the time of distribution, the scratch copy is already attached to one of the typed pullouts, and both are kept at the precinct.
c. Other Documents
Depending on the case, other documents that might be prepared and listed are the request for a lab report, sprint reports, aided cards, any notes about the case in the daily activity log (memo book entries) of an officer involved in the case, the handwritten on-line booking arrest sheet, the police officer’s supporting deposition if the complainant is unable to go to the complaint room, requests for commendation, and the stop and frisk report, also known as UF250.
5. Officer Parker’s Understanding of the Procedure and the Procedure Used in This Case
Officer Parker testified that he had been assigned to the 47th Precinct for 2 Vi years and before that he had been at the Police Academy for six months. Parker explained that in this case he wanted to safeguard the gun and vouchered it immediately. Although in the usual case the voucher is given to the desk officer for review and signature, in this instance Parker had Sergeant Heberdunkle, his partner, examine it and when the sergeant approved it, Parker took it to the desk officer who then signed it after checking to see that all the property listed on the voucher was in the security envelope. Parker said that he never saw the scratch copy of the voucher after he gave it to the desk officer and that the practice was for the scratch and typed copies to be attached and given to the property clerk. Parker testified that although he was trained at the Police Academy to keep a copy of every piece of paper he prepared, he did not keep the scratch copy of the voucher.
As for the complaint report, Parker took from a bin kept in the typing room at the precinct a sample form across which was printed "worksheet.” That worksheet was completed with both information that Parker knew from his memory and pedigree information he obtained from the defendant. The scratch copy was submitted, as is procedure, for typing. After it was typed, Parker compared the scratch and typed copy to see that the typed copy was correct, signed the typed copy and stapled the two together. Parker testified that he was never told that the scratch copy of the UF61 was to be included in *91 the package of documents that were to be submitted to the desk officer, and that the checklist listing of "complaint report worksheet” meant any copy of the complaint report, handwritten or typed.
Parker knew he was supposed to get a complaint number, make a photocopy of the typed complaint to take to the complaint room and leave the typed and scratch copy of the complaint at the precinct. But rather than waiting for a number, making a copy of the UF61 and taking that with him to the complaint room, he took both the handwritten scratch copy and the unsigned typed copy that had no complaint number to the complaint room. He was in a great hurry because the car taking him and the defendant to the courthouse was about to leave and another officer was already escorting the defendant to the car.
Parker also explained that he accidentally left the UF61 at the complaint room in the prosecutor’s file. Thinking that because the form had not been given a number it would be of no consequence if he made up a new complaint, he prepared a new one when he returned to the precinct and then made a copy of it. When he was to testify before the Grand Jury, the prosecutor asked for the scratch copy of the second UF61, but Parker was unable to find it.
6. The Loss of the Voucher Warrants an

Inference Adverse to the Prosecution

The draft copy of the voucher could not be found despite a search for it and therefore the People could not meet their Rosario obligation. (People v Banch, 80 NY2d 610 [1992].) Banch reiterated in no uncertain terms the 30-year-old Rosario rule that the prosecutor give the defense "any nonconfidential written or recorded statements of a prosecution witness that relate to the subject matter of the witness’ testimony.” (Supra, at 615.) The Court of Appeals wrote that "due care must be taken in gathering, identifying and producing documents.” (Supra, at 621.) Banch once again showed that the court would not excuse the failure to turn over the material because the defendant was not prejudiced (supra, at 616) and continued to require that the People exercise care to preserve Rosario material until provided to the defense. (People v Martinez, 71 NY2d 937, 940 [1988].) The loss of document requires an appropriate sanction to be fashioned by the trial court, depending on the extent of prejudice to the defendant and the reason for the loss of the material. (People v Banch, 80 NY2d, at 616; People v Martinez, 71 NY2d, at 940.)
Despite the frequency with which Rosario violations occur the evidence shows the police department treats the Rosario rule seriously and views its obligations under that rule with *92 great concern. The department has elaborate procedures for handling police reports and provides substantial training about its procedures. Since 1989, police department policy has covered handwritten notes and scratch copies of documents, including vouchers. Up to the time of the hearing in this case (when the procedures were revised), in those instances in which a scratch copy of a voucher was made, the arresting officer was required to make a photocopy of the scratch copy and put it in his file along with all the other paper work after it was checked by the desk officer. Although the testimony was both that the original scratch copy was retained by the property clerk and that the individual officer was responsible for safeguarding it, the policy was that someone was responsible for preserving the original.
None of the procedures were followed here. Parker testified that he never saw the scratch copy after he gave it to the desk officer for review. Parker did not make a photocopy or retain the original and the desk officer did not preserve the original scratch copy that was left with him.
Even the checklist, which is used to effectuate prompt delivery of paper work to the prosecutor, did not ensure delivery of scratch voucher. The checklist used in this case shows that the sergeant and the prosecutor both saw the voucher. However, when Parker did not write "scratch copy of the voucher” on a blank space on the checklist, he failed to complete the form as is required by department procedure. He also failed to supply a photocopy of the scratch copy to the prosecutor. Further, even if Parker could have reasonably believed the scratch copy was appropriately given to the sergeant for safekeeping by the property clerk, the safekeeping process also failed.
In this case all the copies of the two UF61s were eventually located after postponement of the hearing. But the procedures did not prevent a delay. Although the checklist includes the "complaint report worksheet,” it has no space for the typed complaint report and no entry was made on a blank line for the typed copy. Thus, neither the sergeant nor the prosecutor made a record that the typed copy of the first UF61 was prepared and produced in the complaint room. Further, showing a failure to understand that each document, whether handwritten or typed, had to be taken to the complaint room and given to the defense, Parker testified he thought that any copy of the complaint report, either typed or handwritten worksheet, would justify checking off the line "complaint report worksheet.” Thus, based on Parker’s understanding *93 there would be no way to determine which document was given to the prosecutor or if both were.
Police practices needed to satisfy the Rosario rule are complicated, time consuming, and confusing to the officers who must follow them. These qualities are antithetical to the concerns of the police in the hours after an arrest: to speedily get the defendant to court with all the paper work complete. Parker’s testimony reflected these concerns. He stated that in this case he was in a hurry to leave the precinct because the defendant was already on the way to the car for transport to the complaint room. He also explained that there was a three-hour limit for processing a defendant, and if a longer period was involved, yet another form had to be prepared. He also expressed justifiable confusion about what he was to do about all the copies: scratch, typed, pullout, photocopy.
Recognizing the difficulty of complying with the procedures implementing the Rosario rule, it is incumbent upon the prosecutor and the police department supervisors to impress upon the line police officers that what they do with the arrest paper work may be as important to the outcome of the case as the legality of the arrest itself. Perhaps this can best be done by continuing contact between the prosecutor and the police officers. It is also important for prosecutors and the police department to work out procedures that are internally consistent and that satisfy the needs of both agencies.
However, the procedures to implement the Rosario rule are not only matters for the police department. The Assistant District Attorney assigned to a case is ultimately the person responsible for collecting all the Rosario material so it can be delivered to the defense. This court has frequently witnessed the last minute scramble by a hearing or trial assistant to find missing Rosario material with consequent delays in court proceedings, and imposition of sanctions for lost materials. Unfortunately, no evidence was presented at the hearing in this case to show the training provided to Assistant District Attorneys who deal with cases as they enter the system in the complaint room. Although there was some testimony about the procedure to be used by the prosecutor to get police records without using a subpoena.
No evidence was produced to show whether the prosecutor on duty inquires of officers about the paper work or what efforts are made to locate Rosario material at the complaint stage of the prosecution or to find out if documents were prepared after the arraignment. The frequent adjournments requested by prosecutors to obtain Rosario material indicate *94 that they do not use the checklist to be sure that they have all documents that have been prepared, that they do not ascertain if all the required forms have been prepared, and that they do not determine if documents other than those required have been prepared. It appears the prosecutors in the complaint room do not make an early and vigorous investigation by close questioning of the officers and that they fail to inquire about scratch forms and notes. It is also apparent that prosecutors are unfamiliar with the wide range of police record-keeping practices, and with documents prepared after the complaint room procedures. Instruction for all prosecutors is essential as is their concerted efforts from the inception of the case to learn about the paper trail in their cases.
In light of the circumstances in which loss of the scratch copy of the voucher occurred, this court will take an adverse inference against the prosecutor and conclude that scratch copy of the voucher would not support the testimony given by Officer Parker that he saw a gun butt sticking out of defendant’s sock just prior to the seizure of the weapon.

. The court denied the motion to suppress based on other evidence presented by the People. This opinion is edited and redacted for publication and does not include the reason for ruling on the merits of denying the motion to suppress.

. The documents on the checklist and also set out in the 1991 interim order are:
Reg. for Lab. Exam. (PD 521-161)
Sprint Incident Inquiry (from SPRINT)
Aided Card (both sides) (PD 304-152)
Activity Log Entries (PD 112-145)
*86 OLBS Arrest Worksheet/Rep. (PD 244-159)
Property Clerk Invoice (PD 521-141)
D.A. Copy (PD 571-147-Auto)
Supporting Deposition (PD 244-060)
Stop and Frisk Report (PD 344-151) O.C.C.B. Buy Report (PD 321-152)
Order of Protection
Complaint Report Worksheet (PD 313-152A)
Request for Lab Exam
Controlled Substance (PD 521-162)

. On April 27, April 29 and May 2, 1994, as a result of this hearing, directives were issued by the police department relating to the treatment of the scratch copies of documents that are subsequently typed. On April 27, 1994, the Bronx Command issued an order requiring that all handwritten notes be preserved; that a photocopy of scratch copy of a report that is later typed be placed in the case folder; that a copy of the typed report be made and put in the case folder; and that the original scratch copy be kept at the precinct.
On April 29, 1994, the 47th Precinct directed that scratch copies of vouchers be prepared in every case. The official invoice form is to be given to the vouchering officer by the desk officer only after a scratch copy is prepared. Both the typed and scratch copy are to be submitted to the desk officer for inspection and signature. The officer is to make a photocopy of the scratch copy for the Assistant District Attorney. The scratch copy is to be listed on the checklist and sent to the evidence and property control specialist, who will maintain it in a file in the property room.
On May 2, 1994, a department-wide order directed that the voucher worksheet, any form prepared but not listed on the printed part of the checklist, any scratch copy or draft of a form, and any other note or document including handwritten notes be listed on the blank lines of the checklist. The directive also ordered that all documents listed on the checklist, the originals of any worksheets, and any scratch copies be delivered to the complaint room and that copies of these documents be kept in the case folder.

. It is the regular job of the direct supervisor of each officer as well as the precinct desk officer to check on the contents of each case folder. If the officer fails to follow the rules he or she receives further training and can be disciplined.